Filed 8/10/26  P. v. Fleming CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>          v.<br><br>KEVIN ANDREW FLEMING,<br><br>          Defendant and Appellant. | C103140<br><br>(Super. Ct. No. 18CF04578) |

Defendant Kevin Andrew Fleming was charged with sexual penetration of an unconscious victim, assault with intent to commit a sexual offense, and poisoning or adulterating food or drink.  He eventually pleaded guilty to the adulterating food or drink charge.  The trial court placed him on two years' probation and ordered him to pay more than $38,000 in restitution to the victim.  On appeal, Fleming challenges the victim restitution award as unsupported by the evidence.  We reject this contention and affirm.

BACKGROUND

I.

Fleming worked with the victim's husband, and the two socialized regularly with their wives and other work friends.  The victim described Fleming and his wife as her "very close" friends.

1

Fleming often flirted with the victim and once contacted her via video call while he was masturbating. The victim brushed off his advances and tried to make sure she was never alone with him.

On July 15, 2017, the victim, Fleming, and Fleming's wife attended a progressive party where guests drank alcoholic beverages, ate food, and swam at different houses. The victim suddenly felt extremely intoxicated, vomited, and fell asleep in a bedroom. She woke up to Fleming stroking the back of her thighs and buttocks. Fleming then moved her swimsuit aside and inserted his fingers into her vagina. Although she was still " 'very groggy,' " the victim was able to push Fleming's hand away. They both left the room, and the victim tried to find a ride home. Reluctantly, she agreed to share a rideshare vehicle with Fleming and his wife. Fleming sat in the back next to the victim, while his wife sat in the front. During the ride, the victim tried to rest but was repeatedly disturbed by the feeling of a hand on her leg; each time, she pushed the hand away.

The next day, Fleming sent sexually suggestive text messages to the victim as well as a message saying, " 'Ha, I fingered you last night and you loved it.' " Over the next few months, Fleming continued to send her inappropriate texts. The victim later learned that he had behaved inappropriately with other women in their friend group. The victim contacted law enforcement.

Fleming was charged with sexual penetration of an unconscious victim (Pen. Code, § 289, subd. (d); count 1), assault with intent to commit rape, sodomy, or oral copulation (§ 220, subd. (a)(1); count 2), and poisoning or adulterating food or drink (§ 347, subd. (a)(1); count 3).[1] A jury trial in January and February 2023 ended in a mistrial; a second jury trial was held in July 2024. Fleming pleaded no contest to count 3 in September 2024. The victim testified during both trials. The parties' plea agreement

---

[1] Undesignated statutory references are to the Penal Code.

provided for counts 1 and 2 to be dismissed with a waiver under *People v. Harvey* (1979) 25 Cal.3d 754 and for Fleming to be placed on probation.

## II.

In October 2024, ahead of the sentencing hearing, the victim sent a letter to the trial court describing how the crime had affected her life. The victim explained that "[w]aking up to [Fleming] violating me, touching me in a place only my husband is welcomed, standing over me as I lay helpless, drugged, and unable to fight back or protect myself has to be one of the scariest and traumatizing events a woman could ever go through." Following the incident, she developed anxiety, depression, agoraphobia, panic attacks, post-traumatic stress disorder (PTSD), fear and distrust of men, severe attention deficits, an inability to look strangers in the eye, a lack of motivation, and "decreased overall joy in life." She feared that these issues "will never fully resolve." Her stress was so severe that she suffered hair loss, heart palpitations, and irregular heart rhythms. She had to strive daily to control her stress levels to prevent these physical symptoms from recurring. Her personality had also changed, leading her to become "more quiet" and "afraid to speak [her] mind and be humorous." She had difficulty caring for her two young children. For three and a half years after the incident, she regularly woke up with a racing heart and her body "seiz[ing] as if [she] was trying to get away from something." If her husband tried to kiss her goodbye early in the morning before she woke up, she would push him away. She was only able to wake up normally after spending several years in intensive therapy.

The victim's letter also described her difficulty continuing in her previously successful job in the medical field because she could no longer handle the workload of her patients. She was particularly triggered by patients with PTSD, and she eventually had to leave her role in primary care. Soon after the incident, she had to take a long leave of absence to engage in intensive therapy.

The letter stated that she lost over $35,000 in income during the first year following the July 2017 incident. Between 2019 and 2024, she took a total of 24 weeks off to address her stress and PTSD, which worsened when court proceedings were delayed. She estimated that she lost $12,000 a month in wages during these leaves of absence. Her professional reputation was "destr[oyed]" because of her long absences, and she eventually lost her job in January 2024. She had been unable to work since then. She explained: "I will never return to the person I was before the assault. I will never regain the loss of time due to being mentally and emotionally incapacitated by stress, depression and anxiety, which continue to hinder my relationships today and always will." The letter included W-2 earnings statements showing that her income decreased by $38,416.80 between 2017 and 2018.

During the December 2024 sentencing hearing, the trial court placed Fleming on probation for two years and ordered him to serve 180 days with credit for time served. The court reserved the issue of victim restitution and set a restitution hearing for February 2025.

In January 2025, the prosecution filed a brief asking the trial court to award a total of $38,626.80 in victim restitution, representing $38,416.80 in lost wages between 2017 and 2018 plus $210 in travel costs for both trials.

At the February 2025 restitution hearing, Fleming argued that the victim had failed to show that his conduct had caused her losses in income, emphasizing the absence of a statement from a therapist or physician corroborating that she was unable to work. The prosecution responded that the victim's October 2024 letter and accompanying W-2 statements, her trial testimony, and the fact that the restitution sought was limited to lost wages during the "most egregious" period of her PTSD all supported the requested award.

The trial court granted the request. Relying on its recollection of the victim's trial testimony and her October 2024 letter, the court found that the prosecution had met its

4

burden of showing that Fleming's conduct was a "substantial factor" in causing the victim's injury. The court awarded restitution in the amount of $38,626.80, with interest accruing from the date of sentencing.

Fleming timely appealed.

DISCUSSION

When the victim of a crime has suffered economic loss as a result of a defendant's actions, courts generally are required to order the defendant to pay full restitution to the victim. (§ 1202.4, subd. (f).) A court " ' "must use a rational method that could reasonably be said to make the victim whole." ' " (*People v. Valle* (2023) 93 Cal.App.5th 1329, 1332.) Where, as here, a defendant is ordered to pay restitution as a condition of probation under section 1203.1, the court has broader discretion to impose restitution, so long as it is "reasonably related either to the crime of which the defendant is convicted or to the goal of deterring future criminality." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1123; see also *People v. Martinez* (2017) 2 Cal.5th 1093, 1101-1102 ["A trial court's power to order restitution in probation cases is thus broader than its power to order direct victim restitution under section 1202.4"].) Restitution ordered as a condition of probation "may not be based merely upon the trial court's subjective belief regarding the appropriate compensation; there must be a factual and rational basis for the amount ordered and the defendant must be permitted to dispute the amount or manner in which restitution is to be made." (*Carbajal*, at p. 1125.) A victim's right to restitution is to be " 'broadly and liberally construed.' " (*People v. Stanley* (2012) 54 Cal.4th 734, 737.)

We review a trial court's restitution order for abuse of discretion. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542.) We will reverse only where the order is arbitrary or capricious or where the amount of restitution lacks a "rational and factual basis." (*Ibid.*)

The restitution ordered in this case was well within the trial court's discretion. The victim testified at trial that she experienced significant psychological harm as a result

5

of Fleming's actions. Her October 2024 letter detailed that she suffered anxiety, depression, agoraphobia, panic attacks, PTSD, stress, and severe attention deficits. Her letter explained that, as a result of Fleming's conduct, she was unable to handle the workload of her previously successful medical job and also needed time off for intensive mental health treatment. This was more than sufficient to support an award of restitution for lost wages. (E.g., *People v. Shelly* (2022) 81 Cal.App.5th 181, 199 [victim's testimony may be prima facie evidence of loss].)

We find no merit in Fleming's assertion that the victim's evidence of loss was "not sufficiently itemized." Although the victim did not specify exactly how much time she took off in the first year after the incident, her letter stated that she lost over $35,000 in income. That figure was further supported and clarified by the accompanying W-2 statements from 2017 and 2018, which showed the drop in her earnings between those two years.

These facts make this case different from *In re Travis J.* (2013) 222 Cal.App.4th 187, on which Fleming relies. In that case, a minor fired a gun at the victim's rear tire, causing it to go flat. (*Id.* at p. 191.) The victim did not provide a receipt for the replacement tire or evidence of how much she earned; the juvenile court awarded the victim $850 in restitution "based on its own 'reasonable estimate' of the damages." (*Id.* at p. 203.) The juvenile court reasoned that it would " 'probably' " cost $800 to replace one tire and that $50 in lost wages was appropriate because there was " 'some trouble' " involved in completing that task. (*Ibid.*) The appellate court reversed the order and remanded for recalculation of the award, explaining that there was "no evidence" in the record that the victim paid $800 to replace the tire or that she lost $50 in wages as a result. (*Id.* at p. 204.) Because the juvenile court based its calculation "on nothing more than speculation," its restitution award reflected an abuse of discretion. (*Ibid.*) Here, in contrast, the victim testified at trial, submitted a detailed letter describing her injuries, and

6

provided W-2 statements showing her wages.  As we have said, that was sufficient to support the trial court's restitution award.

DISPOSITION

The judgment is affirmed.


/s/
FEINBERG, J.


We concur:




/s/
HULL, Acting P. J.




/s/
MAURO, J.

7